UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x

ALEJANDRO MUNOZ-GONZALEZ, on behalf of
himself, individually, and on behalf of all others
similarly situated,

Plaintiff,

-against-

D.L.C. LIMOUSINE SERVICE, INC. and CHRIS
THORNTON, individually, and MELISSA
THORNTON, individually, and JOHN D'AGOSTINO,
individually,

Defendants.

---------------------------------------------------------------- x

Case No. 15 Civ. 9368 (JPO)

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
## OF THEIR MOTION FOR SUMMARY JUDGMENT

Of Counsel:

     Katherine C. Glynn, Esq.

15297845-v1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 1

ARGUMENT ................................................................................................................... 12

POINT I  SUMMARY JUDGMENT STANDARD .................................................... 12

POINT II  THE PLAINTIFF'S FLSA AND NEW YORK LABOR LAW CLAIMS OF
OVERTIME VIOLATIONS MUST BE DISMISSED ON THE BASIS THAT
THE DEFENDANTS ARE EXEMPT FROM OVERTIME PROVISIONS
PURSUANT TO THE TAXICAB EXEMPTION ........................................... 12

    A.     The Plaintiff's FLSA Overtime Claims Fail Because D.L.C. Limousine
was in the Business of Operating Taxicabs .......................................... 12

    B.     There is No Question of Fact that the Plaintiff's State Law Claim for
Unpaid Overtime Must be Dismissed on the Basis that the FLSA's
Exemptions Are Controlling in New York .......................................... 16

III.    ALL OF THE PLAINTIFFS' NEW YORK LABOR LAW CLAIMS MUST BE
DISMISSED BECAUSE THEY DID NOT QUALIFY AS "EMPLOYEES"
UNDER THE LAW ........................................................................................ 17

IV.    MANY OF THE PLAINTIFFS' CLAIMS UNDER THE FLSA MUST BE
DISMISSED ON THE GROUNDS THAT THEY ARE TIME BARRED BY
THE STATUTE OF LIMITATIONS .............................................................. 19

V.    THE PLAINTIFFS' CLAIM FOR LIQUIDATED DAMAGES MUST BE
DISMISSED BECAUSE THE DEFENDANTS ACTED IN GOOD FAITH ........ 21

CONCLUSION ................................................................................................................ 23

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Liberty Lobby*,
    477 U.S. 242 (1986)......................................................................................................12

*Arena v. Plandome Taxi, Inc. et al.*,
    2014 WL 1427907 (E.D.N.Y. April 14, 2014) ................................................16, 18

*Brock v. Superior Care, Inc.*,
    840 F.2d 1054 (2d Cir. 1988)......................................................................................21

*Cariani v. D.L.C. Limousine Service, Inc.*,
    363 F. Supp. 2d 637 (S.D.N.Y. 2005)................................................9, 12, 13, 14, 15, 18, 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................................12

*Clarke v. J.P. Morgan Chase Bank, N.A.*,
    2010 WL 1379778 (S.D.N.Y. March 26, 2010) ....................................................17

*El v. Potter*,
    No. 01 Civ. 6125, 2004 WL 2793166 (S.D.N.Y. Dec. 13, 2004)......................20, 21

*Goenaga v. March of Dimes Birth Defects Found.*,
    51 F.3d 14 (2d Cir. 1995)............................................................................................12

*Inclan v. N.Y. Hosp. Grp., Inc.*,
    95 F. Supp. 3d 490 (S.D.N.Y. 2015)........................................................................21

*Kahn v. IBI Armored Services, Inc.*,
    474 F. Supp. 2d 448 (E.D.N.Y. 2007) ....................................................................17

*Lopez v. Corporacion Azucarera de P.R.*,
    938 F.2d 1510 (1st Cir. 1991)....................................................................................20

*McLaughlin v. Richland Shoe, Co.*,
    486 U.S. 128 (1988)......................................................................................................20

*Saunders v. City of N.Y.*,
    594 F. Supp. 2d 346 (S.D.N.Y. 2008)......................................................................20

*Torres v. Gristede's Operating Corp.*,
    628 F. Supp. 2d 447 (S.D.N.Y. 2008)......................................................................16

## **STATUTES**

29 U.S.C.S. §213(b)(17) ........................................................................................12

29 U.S.C.S. §216(b) .............................................................................................21

29 U.S.C.S. §255(a) .............................................................................................19

29 U.S.C.S. §260 ..................................................................................................21

29 U.S.C. 201 et seq. sections 7 and Section 13 ..................................................16

FLSA ..............................................................1, 8, 9, 12, 13, 16, 17, 19, 20, 21, 22

Labor Law §651(5)(3) .............................................................................................1

N.Y. Lab. Law § 160 ...............................................................................................1

N.Y. Lab. Law § 651 .........................................................................................1, 17

N.Y. Lab. Law § 652 ............................................................................................17

New York Labor Law §198 .....................................................................................8

## **OTHER AUTHORITIES**

Federal Rule 12(b)(1) ..............................................................................................8

Federal Rules of Civil Procedure Rule 56(b) .....................................................1, 12

N.Y. Comp. Codes R & Regs. Tit.12 §142-2.2 ....................................................17

## PRELIMINARY STATEMENT

Defendants D.L.C. Limousine Service, Inc., Chris Thornton, Melissa Thornton and John D'Agostino, (hereinafter "D.L.C. Limousine") pursuant to Rule 56(b) of the Federal Rules of Civil Procedure ("FRCP") submit this Memorandum of Law in support of their motion for summary judgment. Summary judgment should be granted on behalf of D.L.C. Limousine on the basis that: i) the plaintiff's claim for failure to pay overtime in violation of the Fair Labor Standards Act, 29 U.S.C.S. §201, et seq. ("FLSA") and the N.Y. Lab. Law § 160 and New York Comp. Codes R. & Regs. tit. 12 §142-2.2 must be dismissed because D.L.C. Limousine is exempt from the overtime requirements under the "taxicab" exemption; ii) the plaintiff's claim that D.L.C. Limousine failed to pay minimum wage, or wages pursuant to the "spread of hours provision" or furnish proper wage statements or notices pursuant to the New York Labor Laws and the New York Comp. Codes R. & Regs. must also be dismissed because the laws only apply to "employees" and the plaintiffs are exempted by N.Y. Lab. Law § 651 Labor Law §651(5)(3) because they were "taxicab drivers" and by N.Y. Comp. Codes R. & Regs. Titl. 12, §142-2.14(6) as "driver(s) engaged in operating a taxi;" iii) this action is time barred by the statute of limitations and thus fails as a matter of law; iv) the claim for liquidated damages fail as a matter of law.

## STATEMENT OF FACTS

**The Defendants:**

In approximately 1978 husband and wife Douglas and Chris Thornton started D.L.C. Limousine Service Inc. (hereinafter "D.L.C. Limousine").  (Thornton Aff. ¶3)  The company also did business as Limousine Service of Westchester (hereinafter "LSW") and as DLC Ground Transportation (hereinafter "DLC").  (Id.)  Douglas Thornton passed away in 1994 and his wife Chris Thornton retired in 2010.  (Thornton Aff. ¶5) Their daughter, Defendant Melissa Thornton

began working at D.L.C. Limousine in 2008.  (Thornton Aff. ¶6)  In 2010 Melissa Thornton became the sole owner of D.L.C. Limousine.  (Thornton Aff. ¶6)

While D.L.C. Limousine does not "cruise" for passengers, it does provide transportation to members of the general public upon request.  (Thornton Aff. ¶15)  It receives and accommodates requests for immediate service.  (Id.)  Since 1981, the overwhelming majority of its customers originate from flights arriving at the Westchester County Airport, who seek transportation from its taxi stand to destinations they choose.  (Thornton Aff. ¶7)  D.L.C. Limousine had a contractual relationship with Westchester County between 1981 and April 3, 2016 that allowed it to operate at the airport.  (Thornton Aff. ¶8,13)  It has never had a contract with any of the airlines.  (Thornton Aff. ¶14)  The next largest segment of its clientele consists of members of the general public who contact them by telephone seeking transportation within Westchester County or adjacent areas.  (Thornton Aff. ¶24)  The majority of vehicles in D.L.C. Limousine's fleet are smaller motor vehicles, designed to comfortably seat no more than five people, including the driver.  (Thornton Aff. ¶16)  D.L.C. Limousine posts a fare schedule at the airport that is based upon the distance from the airport, and there is a different fare schedule for the Town Cars.  (Thornton Aff. ¶14)  None of the vehicles have meters or vacancy lights on top.  (Thornton Aff. ¶16)  D.L.C. Limousine hires drivers licensed with the Westchester County Taxi and Limousine Commission, who regulates the for-hire vehicle industry in Westchester County.  (Thornton Aff. ¶20)

The Westchester County Airport is close to the state border with Connecticut, so drivers routinely transport passengers across state lines.  (Thornton Aff. ¶21)  The company's trips are predominantly local in nature, less than seventy miles.  (Thornton Aff. ¶20)  D.L.C. Limousine operates without fixed routes.  (Thornton Aff. ¶21)  It serves the miscellaneous and local transportation needs of its immediate community. (Id.)  These needs include unscheduled trips to

or from transportation terminals (like the airport and train stations) or anywhere else the passengers may request.  (Thornton Aff. ¶25)  Drivers always select the routes taken or rely on their navigation systems when transporting customers, unless directed by the customer to follow a different route.  (Thornton Aff. ¶22)

**D.L.C. Limousine's Agreements with Westchester County:**

In 1981 the County of Westchester entered into its first agreement with D.L.C. Limousine that permitted it to provide taxi and limousine services out of the Westchester County Airport to anyone seeking transportation from the airport.  (Thornton Aff. ¶8)  That original agreement has been renewed numerous times since 1981 (hereinafter "The Agreements").  (Thornton Aff. ¶8, 9, 10, 11, 12, Ex. A, B, C, D, E)  These agreements have allowed D.L.C. Limousine to maintain a counter and a "taxistand" at the airport for anyone seeking taxi or limousine service, and to park its vehicles at the airport.  (Thornton Aff. ¶14)

The March 21, 1989 agreement between the parties specifically granted D.L.C. Limousine permission to "conduct taxi and limousine service at the airport."  (Thornton Aff. Ex. A, p.2)  In exchange, D.L.C. Limousine had to pay a monthly permit fee to Westchester County and post all rates for fares at the airport.  (Thornton Aff. Ex. A, pp. 3, 7)  Such rates had to be "commercially reasonable" and subject to the approval of the County.  (Thornton Aff. Ex. A, pp. 3, 6-7)

The agreement entered between D.L.C. Limousine and Westchester County in November 2000, and all agreements since then stated that Westchester County granted D.L.C. Limousine a license to operate a 160 square foot counter and dispatching space within the airport and 1,200 square feet for curbside parking, and approximately 2,800 square feet for a vehicle staging area, "for the following purposes and no other:

> "For the operation of a first class full-service taxi/limousine service for the convenience of travelers, airport users, and the general public."  (Thornton Aff. Ex. C, p.2)

The contract between Westchester County and D.L.C. Limousine between 2005 and 2010 required the company to operate at the airport seven days a week, to be open for business during all hours of airline activity and required D.L.C. Limousine to pay rent on a monthly basis and a percentage of monthly gross revenue to Westchester County.  It also set the prices to be charged to the public.  (Thornton Aff. Ex. D, p. 14)  It specifically provided:

> "All taxi/limousine services shall be made available to the public at reasonable prices and further warrants that they shall be of first quality.  For purposes of this Agreement, "reasonable prices" shall mean prices that are comparable to prices for services offered by first class full-service taxi/limousine service providers within a fifteen mile radius of Westchester County Airport.  The County reserves the right of final approval on all prices charged at the Concession.  A list of current prices is attached as Schedule C".  (Thornton Aff. Ex. D, p.14)

The Schedule C provided the exact rate to be charged for transporting customers to specific towns identified in Westchester County, Connecticut, Rockland County and the five boroughs of New York City.  (Thornton Ex. D, Schedule C at Bates number DLC00064)  On June 24, 2010 Westchester County notified D.L.C. Limousine that it was renewing the 2005 to 2010 contract and it would not expire until November 2015.  (Thornton Aff. ¶12, Ex. E)  Ultimately that contract remained in effect until April 3, 2016, when Westchester County awarded the contract to another company.  (Thornton Aff. ¶13)

**D.L.C. Limousine's Fleet:**

D.L.C. Limousine's fleet has always contained taxicabs and sedans (also known as Town Cars).  (Thornton Aff. ¶17)  D.L.C. Ground Transportation ("DLC") was the face of the taxicab work and LSW was the public face of the sedan work.  (Thornton Aff. ¶18)  All drivers hired by D.L.C. Limousine were expected to and did taxi work, but not all drivers operated sedans.

(Glynn Aff. Ex. M, Fitzmaurice Tr. pp. 35-36)  All trips performed with a taxicab were typically performed in a Grand Marquis or Crown Victoria. (Glynn Aff. Ex. M, Fitzmaurice Tr. pp. 67-68; Glynn Aff. Ex. L Thornton Tr. p. 53)  Taxis are typically an older vehicle than a sedan.  (Glynn Aff. Ex. L Thornton Tr. pp. 53-54)  Sedans are more expensive or newer vehicles and typically a Lincoln Towncar or a Cadillac DTS.  (Id.)  At the time of the plaintiffs' employment in 2013, D.L.C. Limousine's fleet primarily consisted of twelve taxicabs and six sedans/Town Cars. (Thornton Aff. ¶17)

**Percentage of Taxicab Work Versus Sedan Work:**

The vast majority of D.L.C. Limousine's work has always been in taxicabs and/or trips performed on behalf of Westchester County Airport clients. (Thornton Aff. ¶23-24, Ex. F) During his deposition, D.L.C. Limousine's General Manager Gerald Fitzmaurice was asked to opine as to the percentage of taxi versus sedan work for D.L.C. Limousine.  He testified, "About two years ago the breakdown would be, I mean, I would have to go into the computer,  but my best recollection would have been like 65 percent, 60, 65 percent D.L.C., 35 percent LSW." (Glynn Aff. Ex. M, Fitzmaurice Tr. p. 30)   Defendant Melissa Thornton testified that the majority of the drivers' work is taxi.  She estimated it was more than fifty percent, "perhaps 60 percent."  (Glynn Aff. Ex. L, Thornton Tr. pp. 22-23)

Since their depositions, Ms. Thornton went into D.L.C. Limousine's computer system and retrieved the total number of trips performed for the years 2009 to 2015.  (Thornton Aff. Ex. F; Thorton Aff. ¶23)  Every time D.L.C. Limousine is hired, each trip is coded as either a taxi or sedan trip and entered into the computer. (Id.) Below is the information retrieved, and it further breaks down the number of trips performed solely in taxis for D.L.C. and the number of trips performed in sedans for LSW.  (Id.) It also identifies the total number of trips performed on behalf of the Westchester County Airport.  (Id.)

5

| Year | Total # of Trips | LSW(Sedan) | D.L.C.(Taxi) | Airport Work |
|------|------------------|------------|--------------|--------------|
| 2009 | 51,006 | 3,336 (6.5%) | 47,670 (93.5%) | 46,603 (91%) |
| 2010 | 61,018 | 5,667 (9.2%) | 55,351 (90.8%) | 55,274 (90%) |
| 2011 | 60,053 | 6,770 (11.2%) | 53,283 (88.8%) | 52,147 (87%) |
| 2012 | 60,347 | 7,111 (11.7%) | 53,236 (88.3%) | 49,157 (81%) |
| 2013 | 57,020 | 9,313 (16.3%) | 47,707 (83.7%) | 43,497 (76%) |
| 2014 | 59,974 | 10,741 (17.9%) | 49,233 (82.1%) | 44,778 (75%) |
| 2015 | 55,806 | 10,263 (18.3%) | 45,543 (81.7%) | 44,622 (80%) |

**Non-Westchester County Airport Work:**

Aside from the work generated from The Agreements between Westchester County and D.L.C. Limousine, most of the work comes from the general public who telephone D.L.C Limousine seeking transportation.  (Thornton Aff. ¶24)  Between the years 2009 and 2011, 88.8% to 93.5% of the work performed by D.L.C. Limousine was on behalf of passengers arriving at the Westchester County Airport.  (Thornton Aff. Ex. F)  The remaining 6.5% to 11.2% work came from telephone calls from miscellaneous telephone calls from the general public for transportation.  (Thornton Aff. ¶24, Ex. F)

Between 2012 and 2015, The Agreements between Westchester County and D.L.C. Limousine generated between 75% to 81% of all of D.L.C. Limousine's work.  (Thornton Aff. ¶23, Ex. F)  Calls from the general public amounted to between 17.33% to 23.22%.  (Thornton Aff. ¶24, Ex. F)  During the same time frame, the smallest percentage of work came from contracts with Doral Arrowwood and PepsiCo.  (Thornton Aff. ¶¶25, 26)  These contracts provided very little work for D.L.C. Limousine.  As demonstrated below, the two businesses combined provided less than two percent of D.L.C. Limousine's overall business.

Between June 2012 and December 2014 a contract existed between D.L.C. Limousine and Doral Arrowwood ("Doral") in Rye Brook, New York to provide sedan services, "to various locations depending on Client requests." (Thornton Aff. ¶25, Ex.G; Glynn Aff. Ex. L; Thorton Tr. pp. 63-64)  Doral is a hotel located in Westchester County who required D.L.C. Limousine to enter the contract in order to obtain the business.  (Glynn Aff. Ex. M, Fitzmaurice Tr. p. 42) LSW maintained a desk in the lobby of the hotel.  (Thornton Aff. ¶25, Glynn Aff. Ex. L Thornton Tr. p. 88)  Anyone could independently contact D.L.C. to hire a taxi to or from Doral, but it was separate and unrelated to the contract.  (Glynn Aff. Ex. L, Thornton Tr. pp. 88-89)

The arrangement with Doral provided so little work for D.L.C. Limousine that Defendant Melissa Thornton ended the relationship.  (Thornton Aff. ¶25)  The chart below demonstrates the exact number of trips performed on behalf of Doral between 2012 and 2014.  It never exceeded two percent of D.L.C. Limousine's overall business.  (Thornton Aff. ¶25)

| YEAR | Doral Trips | Total D.L.C. Limo Trips | % of D.L.C. Limo Trips |
|------|-------------|-------------------------|------------------------|
| 2012 | 1,012 | 60,347 | 1.67% |
| 2013 | 1,093 | 57,020 | 1.91% |
| 2014 | 989 | 59,974 | 1.64% |

Since 2013 D.L.C. Limousine has had a contract with PepsiCo in White Plains, New York to provide sedan services.  The contract has provided even less work than the Doral contract.  (Thornton Aff. Ex. F) As seen below, the total work has not even reached one percent of overall trips.

| YEAR | PepsiCo Trips | Total D.L.C. Limo Trips | % of D.L.C. Limo Trips |
|------|---------------|-------------------------|------------------------|
| 2013 | 17 | 57,020 | .02% |
| 2014 | 87 | 59,974 | .14% |

| | | | |
|---|---|---|---|
| 2015 | 513 | 55,806 | .91% |
| 2016 | 152 | 21,915[1] | .69% |

**Driver Compensation:**

Driver compensation has been commission based since approximately 2008.  (Thornton Aff. ¶27)  All drivers received twenty percent of each trip, but received a fifteen percent gratuity for a taxi trip, and a twenty percent gratuity for a sedan trip. (Id.) D.L.C. Limousine charged passengers higher rates for a sedan trip than a taxi trip.  (Thornton Aff. ¶14)  Since sedan rates were higher, a driver would receive more money for a sedan trip than a taxicab trip.   D.L.C. Limousine has never paid overtime to its drivers because it believes the taxicab exemption applies to the drivers.  (Thornton Aff. ¶28) As discussed in greater detail below, that belief was reinforced by Judge McMahon's 2005 ruling in the Southern District that the taxicab exemption applied to D.L.C. Limousine.  (Id.)  In 2010 D.L.C. Limousine was sued again in the Southern District of New York on the same issue, but the plaintiff voluntarily withdrew the action in 2011 when she was convinced the taxicab exemption applied.  (Thornton Aff. ¶29)

**Cariani v. D.L.C. Limousine & Taxicab Exemption:**

On October 23, 2000, former driver Enzo Cariani filed a Complaint against D.L.C. Limousine in the Southern District of New York alleging failure to pay overtime in violation of Fair Labor Standards Act 29 USC §201 et seq. (hereinafter the FLSA) and New York Labor Law §198. (Glynn Aff. Ex. C)  Based upon the taxicab exemption, Defendant D.L.C. Limousine filed a motion to dismiss pursuant to Federal Rule 12(b)(1) for lack of subject matter jurisdiction and Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  (Glynn Aff. Ex. D) Plaintiff Cariani filed an affidavit that stated he drove a Crown Victoria for D.L.C. Limousine, he did not have fixed routes or schedules, was not permitted to "cruise" for fares and almost all

---

[1] Between January 2, 2016 and October 20, 2016 the total trips performed by D.L.C. Limousine is 21,915. Thornton Aff. ¶26)

of his trips were within a seventy (70) mile radius of the Westchester County Airport (except for one).  (Glynn Aff., Ex.E ¶3,4,7).  His uniform was a black suit, white shirt and black tie. (Id. at ¶12)

After the motion to dismiss and plaintiff's cross motion were fully briefed and filed, Judge McMahon issued her Order For Additional Discovery. (Glynn Aff. Ex. F)  She gave the parties an additional two and a half months to conduct discovery on the issue of the taxicab exemption. (Id.)  She then ordered supplemental briefing on whether the taxicab exemption applied.  (Id.)  Judge McMahon ruled in Cariani v. D.L.C. Limousine Service, Inc., 363 F. Supp. 2d. 637 (S.D.N.Y. 2005) that the taxicab exemption applied under both the FLSA and the New York Labor Law, and dismissed the case in its entirety.  (Glynn Aff. Ex. G)

**Caman v. D.L.C. Limousine & Taxicab Exemption**:

On September 20, 2010 former driver Marie Caman filed a Complaint against D.L.C. Limousine in the Southern District of New York alleging failure to pay overtime pursuant to the FLSA and New York Labor Law, failure to pay minimum wage and failure to compensate for spread of hours pay and meal breaks.  (Glynn Aff. Ex. H) Defendant D.L.C. Limousine raised the taxicab exemption in its Answer and its attorneys' drafted and served its December 16, 2010 letter explaining its defenses and why there were no wage and hour violations.  (Glynn Aff. Ex. I; Thornton Aff. ¶29, Ex. J) The plaintiff voluntarily dismissed the action with prejudice in February 2011.  (Thornton Aff. ¶29, Ex. K)

**Plaintiff Alejandro Munoz-Gonzalez:**

On December 2, 2015 Alejandro Munoz-Gonzalez (hereinafter "Mr. Munoz") filed his Complaint in this lawsuit.  (Glynn Aff. Ex. A)  Mr. Munoz alleges in his Complaint that the Defendants violated the FLSA and New York Labor Law by not paying overtime, minimum wage, spread of hours pay, and failed to furnish proper wage statements and notices.  On March

9

3, 2016 the Defendants filed their Answer and asserted their affirmative defenses that the taxicab exemption applies and that the plaintiff was not an "employee" under the law. (Glynn Aff. Ex. B)

Mr. Munoz worked transporting clients on behalf of D.L.C. Limousine from January 2, 2013 until June 27, 2013. (Glynn Aff. Ex. N, Munoz Tr. pp. 67, 69) He took approximately three weeks off during his brief five month tenure with D.L.C. Limousine so he could visit Mexico. (Glynn Aff. Ex. N, Munoz Tr. pp. 29-30, 68-69) Mr. Munoz is from Mexico and not fluent in English. (Glynn Aff. Ex. N Munoz Tr. p. 6) He requested and had a translator for his deposition in this case. (Id.) He testified he was a limousine driver and not a taxicab driver for D.L.C. Limousine because he had to dress professionally, could not pick up clients who hailed him on the street, he did not have to purchase his own gasoline, rent the vehicle or pay for repairs and tolls. (Glynn Aff. Ex. N, Munoz Tr. p.21)

Mr. Munoz testified he chose to work seven days a week and every day began his shift by reporting to D.L.C. Limousine's base at the airport, where he parked his car and informed the dispatcher he was on premises. (Glynn Aff., Ex. N, Munoz Tr. pp. 33 - 34) He then sat in the airport waiting for an assignment with other drivers near D.L.C. Limousine's counter. (Id. at 34-38) Mr. Munoz would typically drive right back to the airport and wait for his next assignment after dropping his first passenger off at their requested destination. (Id. at p. 49) He further testified that most of the passengers he transported were individuals that were coming in and arriving on an airplane in the Westchester County airport. (Id. at pp. 50 – 51) He drove a vehicle that fit four passengers plus the driver. (Id. at pp. 52-53) He testified he drove a Ford Towncar most of the time. (Id.)

Mr. Munoz testified that D.L.C. Limousine gave him a Driver Payment Detail with his paychecks that listed every single trip he performed. (Glynn Aff. Ex. N, Munoz Tr. pp. 47-48)

The Detail included the date of each trip, time, client, where clients were being transported to and from, what the trip cost and the driver's compensation.  (Id. at pp. 47-48)  He checked the Driver Payment Detail for accuracy when he received it.  (Id. at p. 48)  Every single one of Mr. Munoz's Driver Payment Details is attached to Thornton Affidavit as Exhibit L.  The Detail also includes the Vehicle Number used for each trip.  Ms. Thornton reviewed every trip performed by Mr. Munoz, and every trip was performed in a taxicab, not a sedan or Town Car.  (Thornton Aff. ¶33)

The Driver Payment Detail also demonstrates how all the trips performed by Mr. Munoz were local in nature because it lists the "Pickup" and "Dropoff" location.  The overwhelming majority of his trips on the Driver Payment Detail were between the Westchester County Airport (listed as either WESTCHESTER, County Airport or HPN) and towns within Westchester County or lower Connecticut, all within a 30 miles radius of the airport.  (Thornton Aff. ¶33)  He drove to Newark Airport twice (48 miles from Westchester County Airport), to JFK on nine occasions, (43.7 miles from Westchester Airport) and La Guardia twenty-five times, which is only 29.7 miles from Westchester Airport.  (Id.)

Mr. Munoz testified that the destinations he took passengers were "variable" and could include destinations like the White Plains train station, Stamford train station, airports, restaurants, museums, hotels, clubs and discotheque.  (Glynn Aff. Ex. N, Munoz Tr. pp. 57-60)  He further testified that he either chose the route taken, he asked the passengers if they wanted to give him directions, or he used his GPS.  (Id.)

**ARGUMENT**

**POINT I**

**SUMMARY JUDGMENT STANDARD**

A motion for summary judgment will be granted under Federal Rule 56, if the entire record demonstrates that, "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, 477 U.S. 242, 250 (1986)  The movants will prevail if they can show an absence of evidence to support an essential element of the nonmoving party's claim.  Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986)  Once the movant has demonstrated that there is no genuine issues of material fact, the opposing party must, "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 248.  As will be demonstrated below, there is no genuine issue of material fact, and the Defendants are entitled to judgment as a matter of law.

**POINT II**

**THE PLAINTIFF'S FLSA AND NEW YORK LABOR LAW CLAIMS OF OVERTIME VIOLATIONS MUST BE DISMISSED ON THE BASIS THAT THE DEFENDANTS ARE EXEMPT FROM OVERTIME PROVISIONS PURSUANT TO THE TAXICAB EXEMPTION**

**A.     The Plaintiff's FLSA Overtime Claims Fail Because D.L.C. Limousine was in the Business of Operating Taxicabs:**

The plaintiff alleges he was entitled to overtime pay.  However, the Defendants were never under any legal obligation to pay the plaintiff or any driver overtime because they are exempt pursuant to the Taxicab Exemption. 29 U.S.C.S. §213(b)(17) provides that the overtime provisions of the FLSA, "shall not apply with respect to . . . any driver employed by an employer engaged in the business of operating taxicabs."  In Cariani v. D.L.C. Limousine Serv., 363 F. Supp. 2d 637 (S.D.N.Y. 2005), the Court addressed the issue of whether the taxicab exemption

12

applied to D.L.C. Limousine.  Since the FLSA does not define "business of operating taxicabs," the Court deferred to the definition contained in the Department of Labor's Field Operations Handbook (1999 Ed.), as follows:

> 24h 01 "Business of operating taxicabs:"  The taxicab business consists normally of common carrier transportation in small motor vehicles of persons and such property as they may carry with them to any requested destination in the community.  The business operates without fixed routes or contracts for recurrent transportation.  It serves the miscellaneous and predominantly local transportation needs of the community.  It may include such occasional and unscheduled trips to or from transportation terminals as the individual passengers may request, and may include stands at the transportation terminals as well as other places where numerous demands for taxicab transportation may be expected.

Cariani, 363 F. Supp. 2d at 641

The Cariani Court concluded that under the definition above, the D.L.C. Limousine was subject to the taxicab exemption.  The undisputed facts cited by the Cariani Court in reaching its conclusion that the taxicab exemption applied to D.L.C. Limousine in 2005 are the same undisputed facts before the Court today.  In Cariani, the Court noted that there was no dispute of the following relevant facts: D.L.C. had been operating in Westchester County since the early 1980s and had a permit to conduct taxi/limousine service out of a leased premises at the Westchester County Airport.  Cariani, 363 F. Supp. 2d at 639. The record included the 1989 and 2001 agreements between D.L.C. Limousine and the County and the Court noted that The Agreements allowed D.L.C. Limousine to use space in the airport.  Id. Specifically, 160 square feet in the 2001 Agreement, plus 1200 square feet for curbside parking and 2800 square feet for a vehicle staging area.  Id. The company was hired to provide, "first class full-service taxi/limousine service for the convenience of airport users and the general public."  Id. D.L.C. Limousine's fleet consisted of seven cars, six of which were five passenger vehicles (including the driver) and one Town Car, for which it charged higher rates.  Id. The cars were dispatched

both from the Airport or by telephone when a customer called to arrange service.  None of the cars had meters or taxi "vacancy" lights on top.  Id.

The undisputed facts referenced by the Cariani Court and still undisputed today.  The most recent agreement between Westchester County and D.L.C. Limousine still provided for the 160 square feet of counter and dispatching area, 1,200 square feet for curbside parking and 2,800 square feet for vehicle staging.  (Thornton Ex. D, p.2)  D.L.C. Limousine still hires drivers licensed by the Westchester County Taxi and Limousine Commission and provides transportation to airports in New York and New Jersey.  (Thornton Aff. ¶20)  It operates within a 70 miles radius of the Westchester County Airport, and still does not have fixed routes or pre-determined schedules, and the cars go where customers wish.  (Thornton Aff. ¶21)  All cars are either contracted at the airport or radio dispatched and do not cruise the streets for passengers.  D.L.C. Limousine posts a fare schedule at the airport that is based upon the distance from the airport (zone based), and there is a different fare schedule for the Town Cars.  Cariani at 639-640.  (Thornton Aff. ¶¶14, 15)

D.L.C. Limousine has not changed how it operates and does business the same way it did at the time of the Cariani case.  Up until April 3, 2016, the majority of its work has always originated from the Westchester County Airport and was mostly taxi work.  At the time of the Cariani decision in 2005 the fleet consisted of six taxicabs and one sedan.  Cariani, at 639.  In 2013 the fleet grew to twelve taxicabs and six sedans.  The fleet grew in size, but consists of the same types of vehicles.  (Thornton Aff. ¶17)  The company has always had a taxicab stand and the bulk of its business is to make unscheduled trips to or from transportation terminals as requested by individual passengers.  (Thornton Aff. ¶15)  The majority of the trips are less than seventy (70) miles.  (Thornton Aff. ¶20)

The most recent contract between Westchester County and D.L.C. Limousine is dated January 23, 2006, and was in place until the relationship ended on April 3, 2016.  (Thornton Aff. ¶¶11, 13)  The latest contract does not change the essential terms of the arrangement that existed at the time of the <u>Cariani</u> decision.

The plaintiff may argue that the existence of the PepsiCo and Doral contracts eliminate the taxicab exemption for D.L.C. Limousine.  However the work under those contracts was miniscule and still local in nature, and should not detract from the fact that more than 98% of D.L.C. Limousine's work was not under contract.  The contractual relationship with PepsiCo has only resulted in an average of 0.44% of D.L.C. Limousine's overall work between 2013 and 2016.  (Thornton Aff. ¶23, Ex. F)  The brief contractual relationship with Doral only resulted in an average of 1.31% of D.L.C. Limousine's overall work between June 2012 and 2014. (Thornton Aff. ¶23, Ex. F)  Also, the Doral contract provided for a counter in the hotel that allowed hotel clients to hire D.L.C. Limousine to transport them locally to destinations they chose in small motor vehicles.  (Thornton Aff. ¶25, Ex. G)  The destinations chosen by Doral clients were miscellaneous and the majority were local in nature, with the majority of trips to the Westchester County Airport, or other area airports or train stations. (Thornton Aff. ¶25)

It should be noted that the <u>Cariani</u> Court specifically discussed, and rejected a "balancing of factors" approach to analysis when determining whether the exemption applied.  <u>Cariani</u>, 363 F. Supp. 2d at 644   As long as the defendant's business met the Department of Labor's definition, the <u>Cariani</u> Court held that the defendant was subject to the exemption even though: i) it did not call itself a taxi; ii) was not regulated as a taxi by local authorities; iii) did not advertise as a taxi; iv) its drivers did not organize their own time; v) its drivers did not "cruise" for passengers; vi) its fares were not metered and were mileage-based and predetermined; vii) its cars sometimes carried more than one passenger; and viii) it made some non-local trips.  <u>Id.</u>

15

The only other case that has contemplated the application of the taxicab exemption in New York is Arena v. Plandome Taxi, Inc. et al., 2014 WL 1427907 (E.D.N.Y. April 14, 2014) In Arena, the Court also deferred to the definition of "Business of operating taxicabs" contained in the Department of Labor's Field Operations Handbook (1999 Ed.) in conducting its analysis on whether the exemption applied.  Id. at *15  Judge Hurley reviewed the following facts in deciding the taxicab exemption did apply:  i) the drivers transported people in small motor vehicles to destinations requested by passengers; ii) the business operated in the local area without fixed routes or contracts for recurrent transportation; iii) the company had taxi stands at a local railroad station and on a local road.  Id.  These same facts apply to D.L.C. Limousine.  It transported passengers in small motor vehicles to destinations chosen by the passengers, operated in the local area of Lower Westchester County without fixed routes and primarily without contracts for recurrent transportation, and had a taxi stand.  Based upon these facts, the exemption still applies to D.L.C. Limousine and these claims must be dismissed.

**B.      There is No Question of Fact that the Plaintiff's State Law Claim for Unpaid Overtime Must be Dismissed on the Basis that the FLSA's Exemptions Are Controlling in New York:**

The plaintiff claims that D.L.C. Limousine violated 12 N.Y. Comp. Codes R. & Regs. titl. 12 § 142-2.2.  That regulation provides that:

> An employer shall pay an employee for overtime at a wage rate of one and one-half times the employee's regular rate in the manner and methods provided in and ***subject to the exemptions of sections 7 and Section 13 of 29 U.S.C. 201 et seq., the Fair Labor Standards Act of 1938. . . . .*** (Emphasis Added)

The New York Courts recognize that because New York's overtime exemptions are specifically defined in reference to the FLSA, the FLSA's exemptions and the interpretations of the FLSA are controlling in New York.  "New York's overtime provisions expressly incorporate

the . . . FLSA . . . exemptions." <u>Torres v. Gristede's Operating Corp.</u>, 628 F. Supp. 2d 447, 455 n. 4 (S.D.N.Y. 2008)  See <u>Clarke v. J.P. Morgan Chase Bank, N.A.</u>, 2010 WL 1379778, *15, n. 7 (S.D.N.Y. March 26, 2010)(stating the plaintiff did not dispute that if he is exempt under the FLSA's administrative or computer employee exemptions, he is also exempt from the New York Labor Law's overtime provisions.")

The Eastern District of New York has found that, "New York's overtime law incorporates most of the FLSA's substantive provisions and exemptions, see N.Y. Comp. Codes R & Regs. Tit.12 §142-2.2, and a court's analysis under federal and state law will, in this and most cases, be the same."  <u>Kahn v. IBI Armored Services, Inc.</u>, 474 F. Supp. 2d 448, 450 n.1 (E.D.N.Y. 2007)(applying the same analysis of applicability of the motor carrier exemption to claims under both FLSA and the New York state overtime law).

As a result of the applicability of FLSA analysis to New York Labor Law claims regarding overtime wages, once this Court concludes that the taxicab exemption applies to D.L.C. Limousine, it must also dispose of the plaintiffs' New York State claims regarding overtime.

**III.    ALL OF THE PLAINTIFFS' NEW YORK LABOR LAW CLAIMS MUST BE DISMISSED BECAUSE THEY DID NOT QUALIFY AS "EMPLOYEES" UNDER THE LAW**

The plaintiffs allege that the Defendants violated the New York Labor Law and New York Codes, Rules and Regulations by not paying minimum wage, spread of hour pay, and failed to furnish proper wage statements and wage notices.  However these claims fail as a matter of law because the plaintiffs were taxicab drivers, and therefore not considered "employees" under these laws.  The N.Y. Lab. Law §652 provides, "every employer shall pay to each of its employees for each hour worked a wage not less than . . ."  However, N.Y. Lab. Law §651(5)(e) defines an "employee" as including, "any individual employed or permitted to work by an

employer in any occupation, *but shall not include* any individual who is employed or permitted to work: (e) as a driver engaged in operating a taxicab." (emphasis added)

Furthermore, the New York Codes, Rules and Regulations provides that an, "Employee means any individual employed, suffered or permitted to work by an employer, except as provided below:

> (6) Taxicab driver.  The term driver engaged in operating a taxicab means an individual employed to drive an automobile equipped to carry no more than seven passengers, which is used in the business of carrying or transporting passengers for hire on a zone or meter fare basis, and the use of which is generally limited to a community's local transportation needs and which is not operated over fixed routes, or between fixed terminals, or under contract."

New York Comp. Codes R. & Regs. tit. 12 §142-2.2

D.L.C. Limousine meets the definition of "Taxicab Driver" as provided by New York Comp. Codes R. & Regs. tit. 12 §142-2.2.  The provision appears to mirror the Department of Labor's Field Operations Handbook (1999 Ed.) definition of "business of operating taxicabs", which the <u>Cariani</u>  Court and <u>Arena</u> Court's deferred to when concluding the taxicab exemption applied.

In this case, D.L.C. Limousine's drivers fit the definition of "Taxicab Driver".  The plaintiffs have operated vehicles equipped to carry no more than seven passengers, Mr. Munoz testified he drove a vehicle that fit four passengers plus the driver.  (Glynn Aff. Ex. N, Munoz Tr. pp. 52-53)  Pursuant to Schedule C of the relevant 2010 through 2016 agreement with Westchester County, the clients were transported on a zone basis.  (Thornton Aff. ¶11, Ex. D, bates range DLC00062-66)  Passengers were charged based upon which specific town or zone they chose to be transported.  As stated by Mr. Munoz, transportation was generally limited to the community's local transportation needs and commonly between fixed terminals.  (Glynn Aff. Ex. N, Munoz Tr. pp. 57-60).  The vast majority of trips were not made under contract,

specifically more than ninety-eight percent of the work performed by D.L.C. Limousine was not under contract between 2012 and 2014, and more than ninety-nine percent in 2015 and 2016. (Thornton Aff. ¶23, Ex. F)  This trace amount of contract work, which was still local in nature, should not eliminate the fact that an overwhelming majority of the work was not under contract.

Based upon the foregoing definitions and the way in which D.L.C. Limousine's drivers conducted business, they met the definition of taxicab driver and are not considered employees under New York's Labor Law and Codes, Rules and Regulations.  As a result, the plaintiffs' claims of failure to pay minimum wage, spread of hour wages and to furnish proper wage statement and wage notices fail as a matter of law and must be dismissed.

## IV.   MANY OF THE PLAINTIFFS' CLAIMS UNDER THE FLSA MUST BE DISMISSED ON THE GROUNDS THAT THEY ARE TIME BARRED BY THE STATUTE OF LIMITATIONS

Mr. Munoz's claims under the FLSA for failure to pay overtime and minimum wage are time barred.  The statute of limitations for an FLSA claim is only two years, but increases to three years only if the claim arises out of a "willful" violation.  29 U.S.C.S. §255(a)  Mr. Munoz worked for D.L.C. Limousine from January 2, 2013 until June 27, 2013.  (Glynn Aff. Ex. N, Munoz Tr. p. 68)  Pursuant to the two year statute of limitations, he had to file suit no later than June 27, 2015.  However, he initiated this lawsuit on December 2, 2015.

Plaintiff Thomas Acheampong's claims under the FLSA for failure to pay overtime and minimum wage are also time barred.  He worked at D.L.C. Limousine from April 22, 2013 until September 17, 2013.  (Thornton Aff. ¶34)  He had to file his suit no later than September 17, 2015, and did not file his Consent to Join Collective Action until December 22, 2015.  (Glynn Aff. ¶ 17, Ex. O) The same is true for Plaintiff Massimo Novello's FLSA claims.  He was employed from August 2, 2012 until January 9, 2013.  (Thornton Aff. ¶35)  His deadline for

filing suit was January 9, 2015.  However, this lawsuit did not commence until December 2, 2015.  (Glynn Aff. ¶ 18, Ex. P) Therefore, his FLSA claims are untimely.

Plaintiff Timothy Geiger is also time barred.  Mr. Geiger was employed as a driver from October 29, 2011 until May 4, 2012.  (Thornton Aff. ¶36)  He was promoted to dispatcher and a manager from May 7, 2012 until March 18, 2016.  (Id.)  Only his time as a driver is relevant to the claims in this lawsuit.  Therefore, his FLSA claims had to be filed by May 4, 2014.  This lawsuit was filed December 2, 2015.  (Glynn Aff. ¶ 19, Ex. Q)  Therefore his claims are barred by the statute of limitations.  Finally, most of plaintiff John Anderson's FLSA claims are time barred.  He was with D.L.C. Limousine from April 15, 2013 until August 15, 2014.  (Thornton Aff. ¶37)  Plaintiff Anderson joined the suit on July 15, 2016.  (Glynn Aff. ¶ 20, Ex. R) Therefore, his claims are limited to the period of July 15, 2014 until August 15, 2014.

The plaintiff has the burden of demonstrating that the three year statute of limitations should apply by showing that D.L.C. Limousine acted willfully in violating the FLSA.  Proof of willfulness requires a "factual showing" of an employer's knowing or reckless violation of the FLSA.  Saunders v. City of N.Y., 594 F. Supp. 2d. 346, 358 (S.D.N.Y. 2008)  An FLSA plaintiff seeking to invoke the three year statute of limitations period cannot survive a motion for summary judgment unless he, "make[s] a competent demonstration that there [is] any trial worthy issue as to whether [the employer] either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute. . . ."  Lopez v. Corporacion Azuccarera de P.R., 938 F.2d. 1510, 1516 (1st Cir. 1991)(quoting McLaughlin v. Richland Shoe, Co., 486 U.S. 128, 133 (1988).  "Willfulness cannot be found where the employer acted negligently or assumed in good faith, but incorrectly, that its conduct complied with the FLSA."  El v. Potter, No. 01 Civ. 6125, 2004 WL 2793166, at *5 (S.D.N.Y. Dec. 13, 2004) Mr. Munoz

20

and the other plaintiffs have not satisfied this burden, and thus the aforementioned plaintiffs'

FLSA claims must be dismissed in their entirety.

## V.     THE PLAINTIFFS' CLAIM FOR LIQUIDATED DAMAGES MUST BE DISMISSED BECAUSE THE DEFENDANTS ACTED IN GOOD FAITH

The plaintiffs' claim for liquidated damages fails because D.L.C. Limousine acted in

good faith and had reasonable grounds for believing the taxicab exemption applied to its drivers.

Pursuant to 29 U.S.C.S. §216(b), an employer is liable for liquidated damages equal to one

hundred percent of the underpayment, unless the employer establishes an exception to the

requirement.   Specifically, if the employer shows to the satisfaction of the Court the act or

omission was in good faith and that it had reasonable grounds for believing its act or omission

was not a violation of the FLSA, the Court may, "in its sound discretion" award no liquidated

damages.  29 U.S.C.S. §260.

In El v. Potter, 2004 WL 2793166 at *13 (S.D.N.Y. Dec. 6, 2004) the Court held the

plaintiffs' claim for liquidated damages failed as a matter of law since the employer acted in

good faith.  The question of liquidated damages is determined by the Court.  Brock v. Superior

Care, Inc., 840 F.2d. 1054 (2d Cir. 1988)(holding that liquidated damages are inapplicable

because of the good faith on the part of the employer).  Such a "defense requires plain and

substantial evidence of at least an honest intention to ascertain what the [FLSA] requires and to

comply with it." Inclan v. N.Y. Hosp. Grp., Inc., 95 F. Supp. 3d 490, 504 (S.D.N.Y. 2015)

The evidence of good faith is plain and abundant in this case.  D.L.C. Limousine was

sued by Enzo Cariani in 2000 in the Southern District of New York and accused of failing to

comply with the FLSA by not paying overtime.  The company hired attorneys to defend the suit

on the basis that the taxicab exemption applied.  Those attorneys researched the law, defended

the decision to apply the taxicab exemption, conducted discovery, and engaged in extensive

motion practice arguing the taxicab exemption applied.  In 2005, a federal judge unequivocally held in <u>Cariani v. D.L.C. Limousine Serv</u>., 363 F. Supp. 2d 637 (S.D.N.Y. 2005)  that the taxicab exemption applied.  There could not be any greater confirmation for any company's decision to continue believing their drivers were subject to the taxicab exemption.

Five years later in 2010, D.L.C. Limousine was sued a second time in the Southern District of  New York for failure to comply with the FLSA and New York Labor Laws.  This time they hired the law firm of Cuddy & Feder LLP to defend them.  Their attorneys once again researched the issue of whether the taxicab exemption applied to their drivers, and concluded that the exemption still applied.  Their attorneys filed an Answer on their behalf asserting the taxicab exemption and served the December 16, 2010 letter to counsel outlining how the exemption applied.  Ultimately they convinced the plaintiff to voluntarily drop the suit on the basis that the taxicab exemption applied.

Five years later, D.L.C. Limousine was sued by Mr. Munoz, even though the company has not changed how it has been doing business.  Up until April of 2016, it remained the same taxicab company with a taxi stand at the Westchester County Airport, and the vast majority of its trips originated from the Westchester County Airport.   It was still providing ground transportation services in vehicles holding five individuals (including the driver) on a zone basis, without fixed routes and satisfying the local community's transportation needs and almost entirely without contracts.  D.L.C. Limousine has spent more time and resources investigating and defending its good faith belief that the taxicab exemption applies than the typical employer.  As a result, the plaintiffs' claim for liquidated damages should be denied.

**CONCLUSION**

Defendants' motion for summary judgment should be granted.

Dated:  New York, New York
        November 1, 2016

                                  **ROBINSON & COLE LLP**

                                  By:_____
                                      Katherine C. Glynn (KG-9541)
                                  Attorneys for Defendants
                                  D.L.C. Limousine Service, Inc.,
                                  Chris Thornton, Melissa Thornton
                                  and John D'Agostino
                                  666 Third Avenue, 20th Floor
                                  New York, New York 10017
                                  (212) 451-2900