UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ALEJANDRO MUNOZ-GONZALEZ, on behalf of himself, individually, and on behalf of all others similarly situated,

Plaintiff,

-against-

D.L.C. LIMOUSINE SERVICE, INC., and CHRIS THORNTON, individually, and MELISSA THORNTON, individually, and JOHN D'AGOSTINO, individually,

Defendants.

**Civil Action No:
15-CV-9368 (JPO)**

### DEFENDANTS' RESPONSE TO PLAINTIFFS' RULE 56.1 STATEMENT

Pursuant to Rule 56.1(b) of the Local Civil Rules of the Southern District of New York, Defendants D.L.C. Limousine Service, Inc., Chris Thornton, Melissa Thornton and John D'Agostino (hereinafter D.L.C. Limousine") submit the following response to Plaintiff's Rule 56.1 Statement.

## I.     RELEVANT PARTIES

1.     Defendant D.L.C. Limousine Service, Inc. ("DLC Limo") is a singular corporate entity that does business under the names of DLC Ground Transportation Services ("DLC Ground") and LSW Chauffeured Transportation ("LSW"). Transcript of deposition of Defendant Melissa Thornton, owner and Chief Executive Officer ("CEO") of DLC Limo ("M. Thornton") pursuant to Fed. R. Civ. P. 30(b)(6), annexed as Exhibit 1, 12:9-17; 13:5-7; 25:7-17; 46:4-7; Transcript of deposition of Gerald Fitzmaurice, General Manager of DLC Limo, annexed as Exhibit 2, 17:20-18:5; 19:10-19; 39:21- 40:5.

**RESPONSE:  Not in dispute**.

2.      In approximately 2010, M. Thornton became the sole owner or the chief executive officer of DLC Limo. Exhibit 1, 9:6-12; 14:8-14; Exhibit 2, 7:8-17.

**RESPONSE:  Not in dispute.**

3.      Before 2010, M. Thornton's mother, Defendant Chris Thornton, was the owner of DLC Limo. Exhibit 1, 9:13-23.  Defendant Chris Thornton, along with her deceased husband, started DLC Limo in approximately 1978. Exhibit 1, 10:2-11.

**RESPONSE:  Not in dispute**.

4.      As the CEO for DLC Limo, M. Thornton's duties included, *inter alia*, setting overall strategy for the company, giving final approval for the hiring of drivers, and terminating drivers. Exhibit 1, 16:10-17:8; 17:25-18:10.  Additionally, M. Thornton also determined the pay structure for the drivers and the rates drivers would receive from fares and set the pay policies for the drivers. Exhibit 1, 18:15-19:6.

**RESPONSE:  Not in dispute.**

5.      Fitzmaurice started working for DLC Limo as a driver and dispatcher in 1992, before becoming a General Manager six months later that same year. Exhibit 2, 6:5-7:7.  As General Manager, Fitzmaurice oversees the drivers, is involved in the hiring and firing of the drivers, and determines the drivers' schedules. Exhibit 2, 22:5-18.

**RESPONSE:  Not in dispute.**

6.      In approximately 2010, Defendant John D'Agostino worked as a driver for DLC Limo, but was eventually promoted to a fleet and driver manager Exhibit 1, 15:10-16:5. D'Agostino is no longer employed by DLC Limo. 65:17-21.

**RESPONSE:  Not in dispute.**

2

## II.     PLAINTIFFS' HOURS WORKED AND COMPENSATION

7.     Drivers employed by DLC Limo commonly worked more than forty hours per week. Exhibit 1, 20:9-15.  DLC Limo never recorded the hours worked by their drivers. Exhibit 1, 103:18-22; Exhibit 2, 82:18-25.

**RESPONSE:  Not in dispute that it was common for drivers to work more than 40 hours in a workweek.  The plaintiffs' cited testimony does not state that DLC Limo never recorded hours worked by drivers.  It states that "the drivers are responsible to track their hours," and that they did it with a driver sheet that they had to input their time in and out for all their trips.  (Ex. 1, pp. 103-104)  Mr. Fitzmaurice testified that DLC Limo did not track "the total hours worked" by the drivers during this time period, but was tracking hours worked by drivers with their required completion of their driver trip tickets every day.  Ex. 2, pp. 81-82.**

8.     Drivers employed by DLC Limo were not compensated at an overtime rate for hours that they worked over forty. Exhibit 1, 20:23-21:3; Exhibit 2, 84:16-18; Transcript of deposition of Plaintiff Alejandro Munoz-Gonzalez annexed as Exhibit 3, 28:6-9; Transcript of deposition of opt-in Plaintiff Abraham Weinstein annexed as Exhibit 4, 36:4-5.

**RESPONSE:  Not in dispute.**

9.     Fitzmaurice testified that he believed limousine drivers were not exempt from overtime pay. Exhibit 2, 84:10-12.

**RESPONSE:  Not in dispute.**

10.     All DLC Limo's drivers are paid by DLC Limo and the paystubs state D.L.C. Limousine Service, Inc., not LSW. Exhibit 2, 20:11-23; Exhibit 9, Driver Paystubs.

**RESPONSE:  Not in dispute.**

11.     All DLC Limo's drivers were paid based upon commission and gratuity only. Exhibit 1, 20:19-22; Exhibit 2, 81:11-14; Exhibit 3, 26:22-27:14.

**RESPONSE:  Not in dispute.**

## III.    LSW AND DLC GROUND

12.     All drivers employed by DLC Limo, including Plaintiffs, performed work for both DLC Ground and LSW. Exhibit 1, 101:12-15; Exhibit 2, 154:24-155:7; Exhibit 4, 46:3-7; 47:13-14; 48:25-49:4; 61:7-14; 81:16-20; 92:17-21; 96:18-23; Exhibit 8, Driver Payment Details. DLC Ground and LSW operate in the same manner, including same staff, same management, same office, and same drivers. Exhibit 1, 25:7-17.

**RESPONSE:  In dispute.   Mr. Fitzmaurice's cited testimony by the plaintiffs does not state that all drivers performed work for both DLC Ground and LSW.  Ex. 2, 154-155. The actual given by Mr. Fitzmaurice was that, "some of those individuals did do LSW calls."  Ex. 2, p. 155.  He also testified that everybody did DLC Ground jobs,  "otherwise they weren't working for us. . . There are drivers that worked that did DLC jobs but never did LSW jobs."  Ex. 2. pp. 35-36.   Ms. Thornton also reviewed the plaintiff Alejandro Munoz-Gonzalez's Driver Payment Detail and checked the types of vehicles used for each trip he performed.   Thornton Aff. ¶33.   He never operated a Town Car, every trip he performed was done in a taxicab, not a sedan so he did not do work for LSW.  Id.   Finally, DLC Ground and LSW did not operate in the same manner, because they did not have the same drivers, not all drivers performed work for LSW.  Thornton Aff. ¶33; Ex. 2 pp. 35-36**.

13.     During the hiring process, DLC Limo explained to drivers that part of their job was to perform both DLC Ground and LSW jobs. Exhibit 2, 86:15-87:12.   Drivers who

performed both DLC Ground and LSW jobs worked out of the same set of instructions from DLC Limo. Exhibit 2, 89:5-25.

**RESPONSE:  In dispute.  The testimony cited by the plaintiffs above does not match the transcript.  Mr. Fitzmaurice's testimony was that the drivers, "were hired to work on the DLC end and some were also afforded the opportunity to work on the LSW end."  Ex. 2, pp. 86-87.  There is no testimony that DLC Limo explained to drivers that part of their job was to perform both DLC and LSW jobs.  Mr. Fitzmaurice did testify that DLC and LSW jobs were performed out of the same set of instructions for the most part.**

14.     DLC Limo's drivers received 20% commission on the fare for both DLC Ground and LSW jobs, but received 15% gratuity for DLC Ground jobs and 20% gratuity for LSW jobs. Exhibit 1, 56:24-57:9; Exhibit 2, 32:11-33:25; Exhibit 4, 50:16-51:7.

**RESPONSE:  Not in dispute.**

15.     DLC Limo charged more for LSW jobs than for DLC Ground jobs, but the drivers always received the same percentage of the fare. Exhibit 1, 25:18-22; 56:3-9; Exhibit 2, 32:11-33:13; 88:10-17; 139: 8-13.

**RESPONSE:  Not in dispute.**

16.     According to Thornton and Fitzmaurice, DLC Limo jobs are split approximately 60 percent DLC Ground, 40 percent LSW. Exhibit 1, 23:4-15; Exhibit 2, 30:11-20.

**RESPONSE:  In dispute.  During his deposition Mr. Fitzmaurice testified that, "I would have to go into the computer" to determine the breakdown between DLC Ground jobs and LSW jobs, but his estimate without checking the computer was 65% DLC to 35% LSW.  Ex. 2, p. 30   After her deposition, Ms. Thornton checked the computer and generated a report using the information in D.L.C. Limousine's computer that allowed her**

to determine the total number of trips performed by D.L.C. Limousine between 2009 and 2015.  Every time D.L.C. Limousine is hired to perform a trip, each trip is coded as either a taxi or sedan trip in the computer.  That allowed her to generate a report that separates out the total number of trips performed in a taxi (DLC work) from a sedan (LSW) work.  It demonstrated that between eighty-one and ninety-three percent of D.L.C. Limousine's trips were performed in taxicabs during those years.  Thornton Aff. ¶23, Ex. F.

17.     The only two differences between DLC Ground services and LSW services are that DLC Limo charges higher fares for LSW jobs and typically use more expensive cars for LSW jobs. Exhibit 1, 25:18-25; 54:22-56:2; 70:12-71:25; Exhibit 2, 62:23-63:2; 88:10-17; 89:20-25.  But DLC Limo used its vehicles interchangeably for LSW jobs and for DLC Ground jobs. Exhibit 1, 59:24-60:5; 82:8-13; Exhibit 2, 67:21-68:17.

**RESPONSE:  It is not in dispute that the only two differences between DLC Ground services and LSW services are that DLC Limo charges higher fares for LSW jobs and typically use more expensive cars for LSW jobs.  It is in dispute that DLC Limo used its vehicles interchangeably for LSW jobs and DLC Ground jobs.   Mr. Fitzmaurice testified that it was rare for a sedan trip to be performed in a taxicab.  Ex. 2, p. 68  Ms. Thornton was asked during her deposition if LSW vehicles were ever used for D.L.C. jobs, to which she responded, "Yes."  Ex. 1, pp. 59-60.**

18.     For trips under twenty miles, DLC Limo established prices that were higher than the average transportation companies." Exhibit 2, 28:2-29:2.

**RESPONSE:  In dispute.  Mr. Fitzmaurice's testimony is completely misstated above.  He testified that the limo prices (sedan trips) were higher than the average competition of taxi drivers or taxi services in the area for trips under 20 miles.  Ex. 2, pp. 28-29.  He then**

6

testified that limo (sedan) prices were similar to taxi services of competitive companies over 20 miles.

III.    **DRIVERS' DUTIES AS CHAUFFEURS**

19.     All jobs performed by DLC Limo drivers would be assigned through DLC Limo's dispatchers, or Fitzmaurice. Exhibit 1, 67:14-68:22; Exhibit 3, 17:13-25; 31:23-32:19; 35:14-24; 49:16-20; 53:12-17; 86:5-7; Exhibit 4, 10:13-17; 88:10-18; 89:10-16; 95:8-18; 96:7-25; 97:11-21.

**RESPONSE:  Not in dispute and violates Rule 56.1 as it is not a statement of material fact.**

20.     The dispatcher, or Fitzmaurice himself, would set the rates. Exhibit 2, 128:10-16; Exhibit 3, 55:6-11.

**RESPONSE:  It violates Rule 56.1 as it is not a statement of material fact.  Notwithstanding the aforementioned objection, the cited testimony does not match the plaintiffs' alleged statement of material fact.  There is no testimony that Mr. Fitzmaurice or the dispatcher set the rates.  The cited question and response of the witness, Mr. Fitzmaurice, is that in a hypothetical situation where a passenger decides to change his/her destination in the middle of the trip, the dispatcher or Mr. Fitzmaurice would decide the rate.  Ex. 2, p. 128.**

21.     Some drivers got their first call when they came in to work, at their scheduled time, while some drivers got their call the night before if DLC Limo received a reservation. Exhibit 2, 23:12-23; Exhibit 3, 34:4-7; Exhibit 4, 56:18-22; 86:18-87:10; 87:18-88:4; 89:3-8.

**RESPONSE:  Not in dispute and it violates Rule 56.1 as it is not a statement of material fact.**

22.     DLC Limo forbade its drivers from picking up passengers on the side of the street, cruising for passengers, or accepting a "street hail." Exhibit 1, 68:4-12; Exhibit 2, 92:4-17.

**RESPONSE:  In dispute and it violates Rule 56.1 as it is not a statement of material fact. See Defendants' response to Plaintiffs' paragraph 24 below.**

23.     DLC Limo did not permit the drivers to exercise discretion in choosing their jobs. Exhibit 2, 93:19-21.  Drivers employed by DLC Limo could be terminated by DLC Limo for refusing to take assigned jobs. Exhibit 2, 94:10-12.

**RESPONSE:  Not in dispute that drivers did not have discretion over choosing jobs, but they were never forced to take a job.  Ex. 2, p. 93.  No one was ever fired for refusing to take a job, it never came up.  Ex. 2, pp. 93-94.  These are not material facts and therefore violates Rule 56.1.**

24.     Plaintiffs and other drivers who worked for DLC Limo were prohibited from picking up their own jobs and were required to procure DLC Limo's permission or authorization. Exhibit 1, 68:4-6; Exhibit 2, 91:18-92:15.

**RESPONSE:  Not a material fact so a violation of Rule 56.1.  The statement of material fact does not match the cited testimony.  Mr. Fitzmaurice's testimony was that a driver could pick up an individual hailing a cab from the side of the road, "only if they called it in to us. It wasn't a frequent occurrence, but they could call and say somebody is waving me down and wants to go someplace.  We would let them know whether they could or could not do it."  Ex. 2 pp. 91-92.  Ms.  Thornton's testimony was that it was "such a rare thing", but I could imagine it could happen.  "In order for that to happen, they would have to speak with the dispatcher and make the arrangements . . ."  Ex. 1, p. 68**

25.     DLC Limo drivers drove customers to destinations out of the State of New York, including Connecticut, New Jersey, Massachusetts, and New Hampshire, which is approximately 250 miles from the Westchester Airport. Exhibit 1, 65:12-18; Exhibit 2, 43:11-44:12; 72:7-73:14.

**RESPONSE:  Not in dispute that DLC Limo drove customers outside of New York or to New Jersey, Connecticut and to Boston, Massachusetts "a couple of times."  Ex. 2, pp. 43-44.  There is no testimony or evidence cited by the plaintiffs that customers were driven to New Hampshire.  Therefore, this is not a proper undisputed fact because it is not followed by citation to evidence which would be admissible as required by Local Rule 56.1 and FRCP 56(3), but is instead a conclusion of plaintiffs' counsel.**

26.     All of the drivers employed by DLC Limo performed DLC Ground jobs and LSW jobs. Exhibit 1, 101:12-102:3; Exhibit 2, 34:25-35:7; 35:25-36:2; 85:19-25; Exhibit 4, 46:3-7. Every day, drivers employed by DLC Limo performed both taxi and limo jobs. Exhibit 2, 66:22-67:4.

**RESPONSE:   In dispute.   Ms. Thornton reviewed all of the plaintiff Munoz-Gonzalez's  trips and determined that all his trips were performed in taxicabs, and none in a sedan.  Thornton Aff. ¶33.  Therefore, he never did work for LSW.   Also the testimony cited for Mr. Fitzmaurice above does not match his actual testimony.  He testified on page 35 that, "everybody was a DLC driver but not everybody was an LSW driver."  The plaintiffs also falsely state above that, "Every day, drivers employed by DLC Limo performed both taxi and limo jobs."  However, the citation they provide does not match that asserted undisputed fact.  The actual testimony was that LSW drivers do taxi jobs every day.  Ex. 2 p. 66-67.**

**IV.     DEFENDANTS' RECURRENT CONTRACTS**

27.     DLC Limo contains a database of repeat customers, including repeat corporate customers. Exhibit 1, 91:4-6; Exhibit 2, 13:15-19; Exhibit 4, 82:20-22; Exhibit 13, Trip Tickets. DLC Limo caters to repeat customers who have an account set up in order to prearrange trips. Exhibit 1, 29:7-16.

**RESPONSE:  In dispute and violates Rule 56.1 as it is not a statement of material fact.  Mr. Fitzmaurice testified that, "we store people's information, so we can make the reservation process smooth, go smoother.  I don't know if it is actually an account, because . . . they would remit payment at the time of the call. . . But we store their information, so we don't have to ask them their phone number and their address every time they call.  I don't know if that constitutes an account of not.  Ex. 2, p. 14.  He further testified that, " I look at a repeat customer as somebody that uses us more than once."  Ex. 2, p. 75**

**The second alleged undisputed fact that, "DLC Limo caters to repeat customers who have an account set up in order to prearrange trips," is not supported by the cited testimony and therefore violates Rule 56.1 as they are alleged facts not in the record and thus unverifiable.**

28.     DLC Limo has accounts set up for their repeat customers. Exhibit 2, 13:23-25; 14: 7-18; 31:9-24; Exhibit 4, 82:20-22; Exhibit 13, Trip Tickets.

**RESPONSE:  In dispute.  This violates Rule 56.1 because it is not a statement of material fact.   Also, plaintiffs' alleged undisputed fact is not supported by the cited testimony and therefore violates Rule 56.1 as they are alleged facts not in the record and thus unverifiable.  See Defendants' response to paragraph 27 above where Mr. Fitzmaurice testified,  "We store people's information, so we can make the reservation process smooth, go smoother.  I don't know if it is actually an account, because . . . they would remit**

payment at the time of the call. . . But we store their information, so we don't have to ask them their phone number and their address every time they call.  I don't know if that constitutes an account of not.  Ex. 2, p. 14.  He further testified that, " I look at a repeat customer as somebody that uses us more than once."  Ex. 2, p. 75

In addition, plaintiffs' citation to trip tickets do not demonstrate the existence of any alleged accounts set up for what plaintiffs' counsel labeled "repeat customers" during the depositions of Ms. Thornton and Mr. Fitzmaurice.

29.    DLC Limo's customers almost always pre-paid their fares and gratuities to DLC Limo, and the gratuities are always set by DLC Limo, not the passengers. Exhibit 1, 95:12-24; Exhibit 2, 15:22-16:18; Exhibit 3, 53:13-23; 54:6-11; 55:2-11; 55:22-56:5; 97:9-19.

**RESPONSE:  A violation of Rule 56.1 as it is not a statement of material fact.  The alleged undisputed facts asserted by the plaintiffs above do not match the cited testimony.  Ms. Thornton testified that gratuities are prepaid when customers go to the DLC taxi stand and prepay their trip.  She only testified that the fares are always established.  Ex. 1, p. 95 There is no testimony cited by the plaintiffs that gratuities are always set by DLC Limo. Therefore, they are alleged facts not in the record and thus unverifiable.**

30.    Many customers knew what DLC Limo would charge them for a trip because these customers have used DLC Limo's services in the past. Exhibit 1, 94:24-95:2.

**RESPONSE:  Not in dispute and a violation of Rule 56.1 as it is not a statement of material fact.**

31.    Defendants sent an invoice to customers who did not provide their credit card information. Exhibit 1, 91:25-92:6.

**RESPONSE:  Not in dispute and a violation of Rule 56.1 as it is not a statement of material fact.  Mr. Fitzmaurice testified that, "We hardly have anybody that's billed.  I don't know a percentage. 97, 98 percent of our calls are either paid by credit card or cash."  Ex. 2. P. 75.**

32.     All DLC Limo repeat customers must prearrange payment and set up accounts. Exhibit 1, 91:7-16; Exhibit 2, 14:19-25.  All DLC Limo customers must have credit cards on file to reserve a vehicle. Exhibit 1, 92:7-24; Exhibit 2, 15:2-9.  DLC Limo does not allow passengers to pay with cash at the end of a trip. Exhibit 1, 92:7-12.

**RESPONSE:  In dispute.  Plaintiffs' paragraph 32 is a violation of Rule 56.1 because it does not contain any statements of material fact.  In addition, the plaintiffs' claim that DLC Limo's repeat customers must prearrange payment and set up accounts is not supported by the testimony cited by the plaintiffs and thus unverifiable.  Ms. Thornton testified that if the customer wishes to set up an account and store that information then DLC Limo would set up that information and that the database has stored information from repeat customers. Ex. 1 p. 91.  Mr. Fitzmaurice testified on the pages cited by the plaintiffs that customers pay at the time of the call with cash or credit card.  Ex. 2, p. 14:19-25.  See also Defendants' response to plaintiffs' paragraph 27 above.**

33.     M. Thornton secured contracts, for DLC Limo, with vendors and repeat corporate customers. Exhibit 1, 33:2-7; Exhibit 2, 13:20-25.

**RESPONSE:  In dispute.  Ms. Thornton did not provide such testimony and thus the alleged facts are not in the record and thus unverifiable.  Ms. Thornton testified that the contracts she secured were with Doral Arrowwood and PepsiCo.  Ex. 1 p. 33.  Mr. Fitzmaurice testified that DLC Limo has very few contracts.  Ex. 2 p. 13.**

34.     From 1981 until 2016, DLC Limo has had a contract with the Westchester County Airport, which stated that drivers must be in operation from a starting point to an ending point each day. Exhibit 1, 19:10-20:8; Exhibit 2, 11:11-16; 37:3-5; 38:13-15.   DLC Limo lost the contract in 2016. Exhibit 2, 11:8-16.

**RESPONSE:  Not in dispute that DLC Limo lost the contract with Westchester County in 2016 and that the contract began in 1981.   The contract provided that DLC Limo had to provide taxi and limousine service to the general public during the hours of operation of the Westchester County Airport.  Thornton Aff. Ex. C pages 2 and 14.  The plaintiffs fail to cite any evidence to support its claim that, "the drivers must be in operation from a starting point to an ending point each day."**

35.     From 2010 through the present, DLC Limo has contracted to be a party to recurrent transportation with other entities. Exhibit 1, 108:4-7.

**RESPONSE: In dispute.  There were only two contracts and neither was in effect in 2010. Thornton Aff. ¶25 - 26.  Doral Arrowwood contract was from June 2012 until December 2014.  Thornton Aff. ¶25 and Ex. G.  The PepsiCo contract was entered into in 2013. Thornton Aff. ¶26.**

36.     DLC Limo entered into written contracts with Doral Arrowwood in approximately July 2012 and PepsiCo in 2013. Exhibit 1, 33:13-24; 51:9-17; 62:4-10; 75:14-20; Exhibit 2, 38:15-24; 40:14-41:8; 137:6-8; Exhibit 5, Doral Arrowwood Contract and PepsiCo Contract.  Under DLC Limo's contract with Doral Arrowwood and PepsiCo, both parties had agreed to a set fare. Exhibit 1, 35:14-19; 89:9-19.

**RESPONSE:  Not in dispute that DLC Limo entered into contract with Doral Arrowwood and PepsiCo.  See response to paragraph 35 for accurate date of contract with Doral Arrowwood.  Not in dispute that the parties agreed on the fare.**

37.     The terms of DLC Limo's contract with Doral Arrowwood provided that DLC Limo maintained a desk in the hotel lobby in order to provide exclusive chauffeur transportation service for the Doral Arrowwood Hotel Conference Center. Exhibit 1, 88:4-16.

**RESPONSE:  Not in dispute that D.L.C. Limo maintained a desk in the hotel lobby to provide sedan services by LSW.  Thornton Aff. ¶25**

38.     DLC Limo has a special flat rate set up for customers between the Ritz Carlton, Westchester Hotel and the MasterCard Headquarters. Exhibit 2, 123:19-126:5.  DLC Limo characterized this as a taxi run and not a limousine run because the customer wanted to pay a lower rate. Exhibit 2, 126:8-17.

**RESPONSE:  In dispute and does not constitute a material fact in violation of Rule 56.1.  The testimony cited by the plaintiffs does not support their alleged undisputed fact and therefore the alleged facts are not in the record and thus unverifiable.  The testimony cited by the plaintiffs states that one individual negotiated a rate of $25 to be driven from Ritz Carlton Westchester and MasterCard headquarters when he chose to hire a taxi.  Ex. 2, 123:19-126.**

39.     DLC Limo provides ground transportation for "Million Air" a private hanger, and its clients. Exhibit 1, 75:23-77:2.  The arrangement between DLC Limo and Million Air was for DLC Limo to take people who were coming off private jets into the hanger and to drive them to where they needed to go. Exhibit 1, 76:14-19; 77:3-7.  Under this arrangement, Million Air's clients do not need to go to DLC Ground's taxi stand to procure ground transportation. Exhibit 1,

76:20-23; 77:8-11.   Million Air's customers would arrange services through Million Air, not with DLC Limo. Exhibit 1, 94:23-95:6.

**RESPONSE:  In dispute.  The testimony cited by the plaintiffs does not support their alleged undisputed fact and therefore the alleged facts are not in the record and thus unverifiable.   The testimony cited by the plaintiffs states that DLC Limo provided transportation to clients of Millionaire and that it did not have any arrangement with Millionaire.  Transportation was provided between DLC Limo and the passenger.  Ex. 1 pp. 75-76  The testimony cited by the plaintiff does not state that Million Air's customers would arrange services through Million Air, not with DLC Limo.**

40.    "Navigators," or The Navigators Group, Inc., is a repeat customer and has a business account set up with DLC Limo. Exhibit 2, 107:24-108:10; 109:8-20.  DLC Limo listed Navigator's owner, Stan Galanski, as a VIP customer. Exhibit 2, 108:22-109:7.

**RESPONSE:  In dispute and a violation of Rule 56.1 as it is not statement of material fact. The cited testimony does not describe Navigators as having a "business account" with DLC Limo, that is an unverifiable term that is not in the record.  Ex. 2, pp. 107-109   Mr. Fitzmaurice did describe Navigators as a repeat customer, and defined "a repeat customer as somebody that uses us more than once." Ex. 2 p. 75., 107-109.  He also said they pay by credit card.  Ex. 2 p. 109.**

41.    "Travelers Indemnity" is DLC Limo's repeat customer. Exhibit 2, 109:21-24.

**RESPONSE:  In dispute and a violation of Rule 56.1 as it is not a statement of material fact.  It is also unverifiable and not in the record and the plaintiffs have misrepresented the testimony they cited.  Mr. Fitzmaurice's testimony in response to the question of whether they were a "repeat customer" was that, "I'm not familiar with them. Looking at this, I**

would say yes, but it is not something that I, you know, it doesn't – I would have to check the computer." **Ex. 2 pp. 109-110**

42.      "It's About Time" is a repeat customer and has an account set up with DLC Limo. Exhibit 2, 115:7-11.

**RESPONSE:  In dispute and a violation of Rule 56.1 as it is not a statement of material fact.  It is also unverifiable and not in the record that they have an account set up with DLC Limo.  The plaintiffs' cited testimony of Mr. Fitzmaurice is that they were a repeat customer, not that an account was set up.  In addition, Mr. Fitzmaurice gave his definition of "a repeat customer as somebody that uses us more than once." Ex. 2 p. 75.**

43.      Fitzmaurice tried to get a contract with Swiss Reinsurance. Exhibit 2, 53:21-22.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1**

44.      Jet Blue was DLC Limo's repeat customer. Exhibit 2, 71:15-17; 117:23-25.  Jet Blue gave DLC Limo vouchers to run on-demand transportation services. Exhibit 2, 72:7-9.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1 Mr. Fitzmaurice defined "a repeat customer as somebody that uses us more than once." Ex. 2 p. 75.  Jet Blue would give DLC Limo a voucher for payment, "there was no account, no contract, no nothing." Ex. 2 pp. 71-72.  DLC Limo would remit that voucher for payment.  Id.  Jet Blue used other taxi companies as well.  Id.**

45.      Hackley School used to be DLC Limo's repeat customer. Exhibit 2, 74:15-16; 115:12-17.  DLC Limo charged the same account when performing services for Hackley School. Exhibit 2, 76:11-16.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1.
Mr. Fitzmaurice defined "a repeat customer as somebody that uses us more than once."
Ex. 2 p. 75.**

46.    "Commonwealth Worldwide Boston" is a repeat customer and has an account set
up with DLC Limo. Exhibit 2, 115:18-23.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1.
Mr. Fitzmaurice defined "a repeat customer as somebody that uses us more than once."
Ex. 2 p. 75.**

47.    Net Jets was a repeat customer. Exhibit 2, 121:23-25.   Through DLC Limo's
arrangement with Net Jets, its passengers never used DLC Ground's taxi stand. Exhibit 1, 77:8-
11.

**RESPONSE:  Not in dispute that Net Jets was a repeat customer, and not a statement of
material fact in violation of Rule 56.1.  Mr. Fitzmaurice defined "a repeat customer as
somebody that uses us more than once."  Ex. 2 p. 75.  It is in dispute and unverifiable and
not in the record that, "through DLC Limo's arrangement with Net Jets, its passengers
never used DLC Ground's taxi stand."  The testimony cited by the plaintiffs actually says
that individuals coming in off Net Jets flights do not have to go to the DLC taxi stand.  Ex.
1, p. 77.  The plaintiffs have misrepresented the testimony of Ms. Thornton.**

48.    DLC Limo has a "complimentary account" in which DLC Limo does not charge
the passenger. Exhibit 2, 110:12-20.   DLC Limo used these accounts to make up for service
issues, to grow the business, or to provide transportation for "friends" of the owner. Exhibit 2,
131:7-21.

**RESPONSE:  The statement is not supported by the cited testimony and thus unverifiable. There is no such testimony on the page cited by the plaintiffs in violation of Rule 56.1.**

49.     DLC Limo set up a donation program to give free rides to "Corporate Angels," but eventually started receiving money from the arrangement because it was used frequently. Exhibit 2, 132:6-20.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1.**

50.     DLC Limo hired salespersons to bring in new business. Exhibit 1, 65:7-11; Exhibit 2, 112:9-23.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1.**

51.     DLC Limo hired Meredith Bach as Director of Sales, specifically for sales and marketing, in order to bring in more business. Exhibit 1, 79:25-80:2-7; Exhibit 2, 113:12-24.

**RESPONSE: Not in dispute and not a statement of material fact in violation of Rule 56.1. Ms. Bach was employed from approximately August 2015 until May 2016. Ex. 1, p. 80.**

52.     Because limousine jobs were more expensive, DLC Limo tried to get more limousine jobs. Exhibit 2, 29:8-16.

**RESPONSE:  Not a statement of material fact in violation of Rule 56.1.   The plaintiffs testimony does not match the testimony cited for Mr. Fitzmaurice.  He actually testified that sedan calls were better calls.  "The calls were for more money, so, sure we would rather – we would try to get some of those.  If we could get more, that would be a good thing." Ex. 2, p. 29.**

## V.     DEFENDANTS COORDINATED WITH "AFFILIATE PROVIDERS"

53.     DLC Limo worked with other ground transportation companies to provide vehicles that DLC Limo does not possess. Exhibit 1, 73:21-74:13.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1.**

54.     DLC Limo employed Gary Pace to handle affiliate relations. Exhibit 1, 72:15-73:7.

**RESPONSE:  In dispute and not a statement of material fact in violation of Rule 56.1.  The plaintiffs completely misrepresent the testimony of Ms. Thornton.  Her actual testimony on the pages cited by the plaintiffs was that Mr. Pace was hired as a dispatcher and that was his primary role, at one point he may have done some affiliate work, "very little though." Ex. 1, pp. 72-73.**

55.     DLC Limo worked with other ground transportation companies to cover the overflow of DLC Limo's business. Exhibit 2, 54:15-55:8.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1. The plaintiffs fail to include the entire testimony on the pages that they cite.   Mr. Fitzmaurice testified that if LSW had overflow business it reached out to other limousine services for assistance, but it rarely ever happened.  Ex. 2. P. 54**

56.     DLC Limo had an affiliate relationship with MTC Limousine ("MTC"). Exhibit 2, 133:20-21.  Pursuant to this affiliate relationship, DLC Limo would run a call for MTC as needed and if DLC Limo runs that call for MTC, DLC Limo would do it was if it were MTC. Exhibit 2, 133:24-134:2.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1.**

57.     Under this relationship, MTC got paid because it provided the service for the passenger, and MTC paid DLC Limo for doing the call. Exhibit 2, 134:10-12.  MTC paid DLC Limo its rate. Exhibit 2, 134:14-16.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1.**

## VI.      DEFENDANTS REQUIRED PLAINTIFFS TO PERFORM FIXED ROUTES

58.      Plaintiffs drove customers from "Point A to Point B," which was fixed, and in turn, customers paid the same prearranged fare. Exhibit 1, 30:10-31:14; 39:21-40:23.

**RESPONSE:  In dispute.  The plaintiffs' cited testimony does not match the alleged statement of material fact.  Ms. Thornton did not testify that the routes were fixed, she said, "I wouldn't consider it a fixed route."  Ex. 1 p. 32  She also did not testify that the fare was prearranged.  The testimony cited by plaintiffs states that, "there is no arrangement . . . If you used my service last week and you went from Point A to Point B and you were charged $75 and you call again this week, it's safe to say that you would be charged the same fare. . ."  Ex. 1 p. 40.**

59.      From 2010 through the present, DLC Limo's jobs for both DLC Ground and LSW are from one prearranged point to a prearranged destination point. Exhibit 1, 110:12-111:6.

**RESPONSE:  In dispute.  See Defendants' response to 58 above.  Also, the plaintiffs' cited testimony does not state that both DLC Ground and LSW jobs were prearranged. It specifically states that the LSW jobs are mainly from one prearranged point to a prearranged destination point.  Ex. 1 p. 110.**

## VII.     CHARACTERISTICS OF DEFENDANTS' TRANSPORTATION SERVICE

60.      DLC Limo drivers all maintained "for-hire" licenses and did not maintain taxi medallions. Exhibit 1, 65:22-66:9; Exhibit 2, 91:10-15.

**RESPONSE:  Not in dispute.**

61.      Vehicles owned by DLC Limo do not have a taxi sign. Exhibit 1, 69:7-15; Exhibit 2, 90:14-19.

**RESPONSE:  Not in dispute.**

62.     Vehicles did not have meters and instead charged on a flat rate basis. Exhibit 1, 69:16-21; 81:20-25; Exhibit 2, 90:18-19.

**RESPONSE:  Not in dispute.**

## VIII.   DEFENDANT DLC LIMO ADVERTISES ITSELF TO THE PUBLIC AS A LIMOUSINE SERVICE COMPANY

63.     LSW advertises as a limousine company. Exhibit 1, 19:4-6; 64:18-20; Exhibit 6, LSW website.

**RESPONSE:   In dispute.   The plaintiffs' cited testimony does not match the alleged statement of material fact in paragraph 63 and thus is unverified in the record.   Exhibit 6 identifies LSW as a car and limo service.**

64.     M. Thornton had the specific intent to advertise on behalf of LSW to grow the limousine side of the business. Exhibit 1, 64:21-23.

**RESPONSE:  In dispute and not a statement of material fact in violation of Rule 56.1.  The plaintiffs' cited testimony does not match the alleged statement of material fact in paragraph 64 and thus is unverified in the record.  Ms. Thornton testified her intent in advertising on behalf of LSW was, "To grow the business."  She never said to grow the limousine side of the business.  When asked if she was specifically trying to grow the limousine business she responded, "I've tried to grow our business as a whole."  Ex. 1 pp. 64-65**

65.     DLC Limo designed a LSW Chauffeured Transportation website specifically intended to advertise chauffeur transportation services at www.lswlimo.com. Exhibit 1, 72:8-14; 78:18-79:7.  DLC Limo also designed a LSW Chauffeured Transportation Brochure specifically intended to advertise chauffeur transportation services. Exhibit 12, LSW Brochure.

**RESPONSE:  Not in dispute and not a statement of material fact in violation of Rule 56.1.**

66.     DLC Limo advertised itself on its website as "evolving into a worldwide network with more than 550 affiliate providers." Exhibit 1, 73:14-20; Exhibit 6, LSW website.

**RESPONSE:  In dispute and not a statement of material fact in violation of Rule 56.1. Exhibit 6 does not contain the language stated by the plaintiffs in paragraph 66.  Also, Ms. Thornton's cited deposition testimony does not match the statement in paragraph 66.  Ms. Thornton agreed that the language read by the attorney during the deposition matched what the document stated.  Ex. 1 p. 73.**

67.     Manta, a website search engine designed for small businesses, advertises D.L.C. Limousine Services, Inc. as a limousine service. Exhibit 1, 82:20-25; Exhibit 11, Manta.com business listing.  The website listed for DLC Limo on www.manta.com is www.lswlimo.com. Exhibit 1, 83:4-10.

**RESPONSE:  In dispute and not a statement of material fact in violation of Rule 56.1.  Ms. Thornton never advertised on www.manta.com and did not know the company was listed on the website until plaintiffs' counsel showed Ms. Thornton the webpage during her deposition.  It was not done with permission from Defendants.  Supp. Thornton Aff. ¶15.**

68.     M. Thornton was featured in an article for the Examiner News, which was intended to advertise "primarily LSW" services. Exhibit 1, 84: 16-87:3; Exhibit 7, Examiner News Article.

**RESPONSE:  In dispute and not a statement of material fact in violation of Rule 56.1.   Ms. Thornton does not remember being interviewed by The Examiner News.  Ex. 1 p. 84.**

69.     The article states that M. Thornton acts as chief executive officer of DLC Limo, "while growing the upscale boutique limousine service offered by LSW Chauffeured

Transportation, which works with executive-level companies throughout the tri-state area." Exhibit 7, Examiner News Article.

**RESPONSE:  Not in dispute what the article states, and not a statement of material fact in violation of Rule 56.1.**

70.     The article also states that DLC Limo's "business partnerships are done through a stringent vetting process to ensure the level of service customers receive, say abroad, is still the same personalized service they will get closer to home." Exhibit 1: 87:8-21; Exhibit 7, Examiner News Article.

**RESPONSE:  Not in dispute what the articles states, and not a statement of material fact in violation of Rule 56.1.**

71.     The advertisement also promotes DLC Limo's exclusive contract with businesses such as Doral Arrowwood Hotel. Exhibit 1, 88:4-16; Exhibit 7, Examiner News Article.

**RESPONSE:  Not in dispute what the articles states and not a statement of material fact in violation of Rule 56.1.**

72.     DLC advertised that under M. Thornton, DLC Limo's fleet doubled in size. Exhibit 1, 74:14-21.

**RESPONSE:  Not a statement of material fact in violation of Rule 56.1 and there is no evidence to support the assertion in paragraph 72 because the cited testimony does not state that DLC advertised that the fleet doubled in size under Ms. Thornton.  Ms. Thornton testified she did not remember being interviewed for the article she was questioned about. Ex. 1, p. 84.**

73.     DLC Limo advertised working relationships on its website with other companies, specifically advertised as "LSW Partners." Exhibit 1, 75:3-10; Exhibit 6, LSW Website.

**RESPONSE:  Not a statement of material fact in violation of Rule 56.1.  Not in dispute that it advertised working relationships with LSW Partners, and Ms. Thornton testified that DLC only had a contract with one of the LSW Partners, which was Doral Arrowwood.  Ex. 1 p. 75.**

Dated: New York, New York
       December 1, 2016

                         ROBINSON & COLE LLP


                         By:_____
                              Katherine C. Glynn (KG-9541)
                         Attorneys for Defendants
                         666 Third Avenue, 20th Floor
                         New York, New York 10017
                         (212) 451-2900

TO:

Jeffrey R. Maguire, Esq. (JM 4821)
The Law Office of Borrelli & Associates, P.L.L.C.
655 Third Avenue, Suite 1821
New York, New York 10017